```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
_____

LUIS MARTINEZ,

               Petitioner,              **No. 10-CV-6042(MAT)**
    -vs-                                          **DECISION AND ORDER**

JAMES T. CONWAY,

               Respondent.
_____

## I. Introduction

Petitioner Luis Martinez ("Martinez" or "Petitioner"), proceeding pro se, seeks a writ of habeas corpus under 28 U.S.C. §2254 challenging his state custody pursuant to his convictions on two counts of first degree robbery and one count of third degree criminal possession of a weapon. For the reasons set forth below, the Petition is dismissed.

## II. Factual Background and Procedural History

At 8:00 p.m. on May 10, 2003, the store manager at the Family Dollar Store, located at 1380 Norton Street in the City of Rochester, James Tolleson ("Tolleson") locked the doors to the store. There were two other employees inside the store, Richard and Kitty Pratt.

About twenty minutes later, as Tolleson attempted to "cash out" the register, two men came bursting out of the back room of the store with "mop heads" on their heads, armed with guns, and

-1-

screaming for everyone "to get down on the floor". One of the firearms appeared to be a rifle.

One of the assailants, later identified as Petitioner, pushed Tolleson to the ground, placed a gun to his head, and asked if he knew what Petitioner was there for. Tolleson, replied, "I said the money. He said, it's not yours, you don't have to worry about it. No sense in being a hero. You know what happens to a hero, he gets a bullet in his head". Petitioner relieved Tolleson of his pager and store keys before searching his pockets for money.

Petitioner then ordered Tolleson to crawl into the back office area and open the store safe. The co-defendant forced Richard Pratt to do the same. While Tolleson and Richard Pratt were being held at gun point, Kitty Pratt remained hidden as the robbery unfolded.

After Tolleson complied with Petitioner's direction to remove the three bags containing cash from the safe, Petitioner ordered Tolleson to crawl to the front of the store to get any cash which might still be in the front registers. As they were approaching the middle register, Petitioner made him stop. Tolleson felt a gun pressed to his head, and "all of the sudden" Petitioner disappeared. As Petitioner was running through the back door he yelled to his accomplice in the back of the store. Tolleson looked through the front window and saw a police officer with his gun drawn.

Once Tolleson heard the "back door alarm go off", he located Richard Pratt, and the two ran out the front doors.

At about 8:30 p.m. the police became aware of a robbery in progress based on a 911 call made by a customer, Matthew Doward ("Doward"), who had arrived at the Family Dollar Store, unaware that it was closed or that it was being robbed. As he was sitting in his car to answer a cell phone call, Doward noticed one of the clerks with his back to the window "flaring his hands around . . . erratically." To the clerk's left, Doward saw a "gentleman with a wig on his head, well actually a mop on his head and an army jacket and he had a rifle."

Within fifteen seconds of the radio transmission, police officers arrived on the scene. After speaking with Doward, Officer Weech hid behind a motor vehicle about twenty feet away from the front door of the store. From there, Officer Weech observed Tolleson crawling on the floor while Petitioner, dressed in a Army-type jacket and disguised with a mop head covering his face, stood over him brandishing a shotgun. Petitioner appeared to have noticed Officer Weech because he "took off" towards the rear of the store.

Petitioner was observed fleeing the scene by Officer Wilson, who had arrived within minutes of the broadcast and was positioned on Branch Street, approximately one block from the rear of the Family Dollar Store. From that location Officer Wilson watched

Petitioner, who was wearing a green Army jacket, blue sweat pants, and blue boots running westbound, at a "brisk" pace in a "crouched down" posture, through various residential yards. When Officer Wilson caught up and came face to face with Petitioner, Petitioner ran away.

During the ensuing foot chase, Petitioner took off his green Army jacket and threw it to the ground. He eventually was located near a door at the corner of a house on Cynthia Lane, trying to secrete himself on a cement patio slab.

Officer Wilson testified that during his pursuit of petitioner, there was "no one else running or walking around" in the area. Petitioner was secured and placed in Officer Wilson's patrol car to be transported to the scene of the robbery for a show-up identification procedure.

While seated in the patrol vehicle, a radio transmission went out that a canine dog and officers were looking for guns in the area. Without being questioned, Petitioner spontaneously blurted out that the police did not have to search for a gun because the gun was plastic and he had already broken it up. Before leaving the area, Officer Wilson retrieved the green Army jacket which Petitioner had discarded.

Upon his return to the Family Dollar Store, prior to any identification procedure, Petitioner offered to tell Investigator

Friday about something "big" which was going to happen that night, apparently in an attempt to avoid participation in the show-up.

During the show-up procedure, Investigator Friday had Tolleson, Richard, and Doward view Petitioner and his co-defendant separately. Tolleson told the police he could identify Petitioner as his assailant by his shoes. Richard Pratt identified Petitioner's pants as being the pants worn by the individual who had controlled Tolleson during the robbery. Finally, Doward identified Petitioner's Army jacket as the jacket worn by the perpetrator who had been wearing a mop and who was brandishing a shotgun during the robbery.

Petitioner was transported to the station where he denied any involvement in the robbery and told the police they did not have anything on him. When asked why he was in the vicinity of the robbery, Petitioner claimed he had been jogging and that he jogs in his boots. As he was talking, Petitioner stuck his foot out and showed the investigator that he was wearing blue work boots.

Although Petitioner claimed he was in the neighborhood to go jogging, a car key found inside of Petitioner's pants pocket was determined to be the key which would have operated a Toyota pick-up truck, located just two blocks from the scene of the robbery. A former girlfriend of Petitioner's testified that he was driving the truck on May 10, 2003, as did the vehicle's owner.

Petitioner's green Army jacket was searched by the police and a strand from a mop was located in the jacket's left breast pocket.

While Investigators Friday and May were dealing with Petitioner, other members of the Rochester Police Department searched the area surrounding the crime scene for weapons.

Rochester Police Officer Daniel Nowack testified about his canine partner's search for nitrate in the area surrounding the crime scene, which culminated in finding a .22 caliber rifle (loaded with one live round of ammunition), a pair of brown work gloves, assorted rolls of change and three money bags underneath a trailer in a vacant lot on the north side of 1223 Portland Avenue. On the south side of 1223 Portland Avenue, the police located a mop head, seven live rounds of .45-caliber ammunition, and "assorted plastic and metal pieces that were consistent with that of a magazine from a weapon". This corroborated Petitioner's story that he had smashed up the gun used, which he claimed was plastic.

Tolleson identified the money bags as being the bank deposit bags taken from his store during the robbery and explained the bags were substantially in the same condition as when he last saw them on May 10, 2003, except the money was gone.

The work gloves (located with the rifle and money bags and in close proximity to the mop head) were submitted for scientific testing. After comparing a partial DNA profile from a swab of the work gloves with a sample from Petitioner, the forensics expert

found that the DNA profile obtained from the right work glove matched the DNA profile of Petitioner in three genetic locations. The probability of selecting an unrelated individual that would have the same DNA type as Petitioner and the swab of the right glove at those three locations would be "less than one in 3,290 people". The DNA on the left glove matched Petitioner's DNA profile at eight locations. The probability of randomly selecting an unrelated individual having the same DNA profile as the swab of the left glove and Petitioner at those eight locations was found to be less than one in 1.51 billion.

The jury returned a verdict convicting Petitioner as charged in the indictment to two counts of first degree robbery and one count of third degree criminal possession of a weapon. He was sentenced on December 23, 2003 to an aggregate determinate term of twenty years imprisonment, with five years of post-release supervision.[1]

**III. Discussion**

    **A.   Ground One: Lack of Probable Cause for Arrest**

Petitioner's claim that his arrest violated his Fourth Amendment right against an unreasonable seizure is barred from

---

[1] Petitioner's co-defendant, Hector Martinez, was convicted on February 17, 2004, following a guilty plea, of one count of Robbery in the First Degree. Hector Martinez's conviction was affirmed on appeal in 2007.

federal habeas corpus review unless the State denied him a full and fair opportunity to litigate that claim. Stone v. Powell, 428 U.S. 465, 481-82 (1976). The Supreme Court explicitly held in Powell that Fourth Amendment claims that have been litigated in state court are not cognizable on habeas review. 428 U.S. at 481-82; accord, e.g., Capellan v. Riley, 975 F.2d 67, 71 (2d Cir. 1992).

Here, Martinez litigated his Fourth Amendment claim at the pretrial suppression hearing and on direct appeal to the Appellate Division. Thus, state corrective process was not only available to petitioner but was utilized by him in seeking redress for his Fourth Amendment claim. Therefore, the claim cannot support a petition for a writ of habeas corpus. See, e.g., Gandarilla v. Artuz, 322 F.3d 182, 185 (2d Cir. 2003) ("[T]he merits of a Fourth Amendment challenge are not reviewable in a federal habeas proceeding if a defendant has had a fair opportunity to litigate that question in State court . . . .").

**B.   Ground Two: Failure to Establish Chain-of-Custody For the DNA Evidence**

Petitioner claims that evidence concerning his DNA being present inside of the work gloves alleged to have been used during the course of the robbery was erroneously admitted into evidence. According to Petitioner, the prosecution failed to demonstrate that the tested evidence had not been contaminated.

Martinez's chain of custody argument presents a question of State evidentiary law that generally is not amenable to habeas review. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Under New York law, "failure to establish a chain of custody may be excused 'where the circumstances provide reasonable assurances of the identity and unchanged condition' of the evidence." People v. Julian, 41 N.Y.2d 340 (1977) (quotation omitted). Furthermore, both federal and state law clearly hold that a defect in the chain of custody goes to the weight of the evidence, not its admissibility. United States v. Hon, 904 F.2d 803, 810 (2d Cir. 1990) ("Once the exhibits were admitted into evidence, the alleged defects in the government's chain of custody proof were for the jury to evaluate in its consideration of the weight to be given to the evidence.")).

**C.   Ground Three:   Excessive Sentence**

Petitioner was subject to a mandatory determinate term of imprisonment upon his first degree robbery conviction, the minimum of which was five years and the maximum of which was twenty-five years. Because a determinate sentence was required to be imposed, there also was a mandatory term of post-release supervision.

It is well settled that a prisoner may not challenge the sentencing judge's discretion when the length of the sentence does not exceed the maximum set by state law. Since the twenty year sentence imposed was well within the range prescribed by state law, and was actually five years less than the statutory maximum, no

question of constitutional dimension has been presented. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law.") (citation omitted) (per curiam).

**D.   Ground Four: Ineffective Assistance of Trial Counsel**

Petitioner asserts that trial counsel was ineffective for failing to obtain adequate pre-trial discovery, for not challenging the admissibility of DNA evidence based on an allegedly deficient chain of custody, for not objecting to bolstering by the People's witnesses and for having moved to preclude rather than suppress identification testimony.

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate both (1) that his counsel's performance "fell below an objective standard of reasonableness" and (2) that the defense was prejudiced, i.e., that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 686, 688, 694 (1984). Even if counsel committed serious errors, a writ of habeas corpus should not issue where there is "overwhelming evidence of guilt." Gersten v. Senkowski, 426 F .3d 588, 611 (2d Cir. 2005). A court considering an ineffectiveness claim need not "address both components of the [Strickland] inquiry if the [petitioner] makes an insufficient

showing on one." Strickland v. Washington, 466 U.S. 686, 697 (1984). "The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel flounder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

Here, Petitioner cannot meet the "prejudice" requirement as the evidence of his guilt was overwhelming, and there is no reasonable probability-or possibility-that the outcome of his trial would have been different had defense counsel taken the actions Petitioner believes he should have taken. Taken singly or together, none of the alleged inadequacies on the part of trial counsel amount to constitutionally ineffective representation which prejudiced Petitioner's rights.

**E.   Ground Five: Denial of Motion for Change of Venue**

Petitioner brought a motion for a change of venue prior to trial. Four days before trial, it was denied as being premature, but the court noted that the issue of pre-trial publicity would be explored as part of the court's inquiry during voir dire. Petitioner did not renew his change-of-venue motion during voir dire, thereby abandoning it. On appeal, the claim was denied as unpreserved.

As Respondent argues, the claim is procedurally defaulted because the appellate court relied on an adequate and independent state ground to dismiss the claim. "[F]ederal habeas courts

generally may not review a state court's denial of a state prisoner's federal constitutional claim if the state court's decision rests on a state procedural default that is independent of the federal question and adequate to support the prisoner's continued custody." Epps v. Commissioner of Corr. Servs., 13 F.3d 615, 617 (2d Cir.) (citations omitted), cert. denied, 114 S. Ct. 1409 (1994). Petitioner has not demonstrated cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would occur, see Coleman v. Thompson, 501 U.S. 722, 730 (1991), if this claim is not reviewed here. Accordingly, the claim is dismissed as subject to an unexcused procedural default.

**F.   Ground Six: Unreasonable Search**

Petitioner challenges the police search of a pick-up truck, not owned by Petitioner, but which contained Petitioner's wallet. As Respondent argues, because the Appellate Division dismissed the claim as unpreserved, it is procedurally defaulted under the adequate and independent state ground doctrine. Furthermore, because the claim merely alleges a Fourth Amendment violation, it is barred from habeas review under Stone v. Powell, 428 U.S. 465, 481-82.

**G.   Ground Seven: Denial of Sixth Amendment Right to Be Present at All Material Stages of Trial**

Petitioner claims his Sixth Amendment right to be present at all material stages of his trial was violated by his absence from a pretrial scheduling conference. The Appellate Division held there

was no Sixth Amendment violation because that conference did not involve factual matters about which Petitioner might have had peculiar knowledge that would be useful in advancing the defense or countering the People's position. This was a correct application of Federal law.

The conference was brief, and consisted merely of co-defendant's counsel informing the court that his client would not be pleading guilty. Because a suppression hearing was required and the witnesses needed to be produced, court was adjourned.

A criminal defendant has a due process right to be present for trial proceedings "to the extent that a fair and just hearing would be thwarted by his absence and to that extent only." Snyder v. Massachusetts, 291 U.S. 97, 108 (1934). A defendant must show not only that his presence would have "contribute[d] to the fairness of the procedure," but also that the procedure itself was "critical to [the] outcome [of the criminal proceeding]." Kentucky v. Stincer, 482 U.S. 730, 745 (1987).

Here, Petitioner has not met his burden. Petitioner claims he could have provided information concerning whether he was entitled to a Wade hearing. The prosecution acknowledged it had no "no facial identifications" of Petitioner by any of the witnesses. Thus, the sole issue to be resolved was legal in nature–whether Petitioner was entitled to a Wade hearing when the prosecution intended to offer resemblance as opposed to identification

testimony. In the argument of a motion to decide a pure question of law, no right to be present inures to a defendant. Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000).

### H. Ground Eight: Denial of Request for Wade Hearing

Petitioner argues that his right to a fair trial was violated when "identification" testimony was elicited without a pre-trial Wade hearing. The trial court had found that a Wade hearing was unnecessary because the witnesses who observed Petitioner in a show-up identification procedure would not make an in-court identification and would instead identify clothing allegedly worn by Petitioner during the robbery.

Assuming the trial court erred in the decision to allow "resemblance testimony" into evidence without a Wade hearing, any error was harmless given the overwhelming evidence of Petitioner's guilt. See Wray v. Johnson, 202 F.3d 515, 525 (2d Cir. 2000) ("Therefore, the erroneous admission of unreliable identification testimony does not warrant relief from the conviction if the error was harmless."). Furthermore, even if a hearing had been held and the "show-up" found suggestive, each witness nonetheless would have been permitted to describe the clothing they observed the robbers wearing.

### I. Ground Nine: Erroneous "Bolstering" Testimony

Petitioner claims that the trial court erroneously allowed "bolstering" testimony by the eyewitnesses, when the prosecutor

asked each witness whether he had informed the police about certain facts to which he had just testified. The testimony was not inadmissible; the response of each witness was permissible to negate the claim of recent fabrication as articulated in defense counsel's opening statement. Moreover, an error of state evidentiary law is not a sufficient predicate for habeas relief, and the overwhelming weight of federal authority in this Circuit holds that "bolstering" of a prosecution witness' testimony does not state a constitutional claim redressable on federal habeas review. Glover v. Burge, 652 F. Supp.2d 373, 377 (W.D.N.Y. 2009) (collecting cases).

### J. Ground Ten: Erroneous Admission of Testimony Narrating the Surveillance Videotape

At trial, the store manager was allowed to identify selected still images from the store's surveillance camera videotape and explain to the jury what was occurring. For instance, he recognized himself being pushed down to the floor, and explained to the jury what transpired when he and the robbers were outside of the "camera shot". Petitioner claims that the store manager essentially testified as an expert witness and invaded the province of the jury.

Defense counsel did not object to the admission of this testimony, and the Appellate Division accordingly found the claim unpreserved. Not only is the claim procedurally defaulted because the court relied upon an adequate and independent state ground for

dismissal, it is without merit as a matter of state and federal evidentiary law. See United States v. Young, 745 F.2d 733, 761 (2d Cir. 1984) ("Generally speaking, a trial judge has broad discretion in deciding whether or not to allow narrative testimony. FED. R. EVID. 611(a). We see no reason to apply a different rule here, where the narrative testimony accompanied and explained videotaped evidence.") (some internal citations omitted).

## IV. Conclusion

For the reasons stated above, Luis Martinez's Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the Petition is dismissed. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal in forma pauperis.

**SO ORDERED.**

S/Michael A. Telesca

_____
MICHAEL A. TELESCA
United States District Judge

DATED:   June 23, 2011
         Rochester, New York